## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AMANDA VARN,             )
                                )
                Plaintiff,    )
                                )
                v.            )      1:21CV807
                                )
KILOLO KIJAKAZI,        )
Acting Commissioner of Social  )
Security,              )
                                )
                Defendant.    )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Amanda Varn, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 15; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 221-35), alleging a disability onset date of February 21, 2020 (see Tr. 221, 227). Upon denial of those applications initially (Tr. 65-90, 119-23) and on reconsideration (Tr. 91-118, 131-48), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 149-50). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 26-64.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 9-21.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 216-20), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2024.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since February 21, 2020, the alleged onset date.
>
> 3. [Plaintiff] has the following severe impairments: obesity; lupus; Sjogren's syndrome; residual effects of lumbar disc surgery with residual degenerative disease and symptoms; anemia; hypertension; hypothyroidism and migraine headache.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

2

. . .

5.   . . . [Plaintiff] has the residual functional capacity to perform light work . . . except: she can perform frequent climbing of ramps and stairs, but only occasional climbing of stepladders up to 4 vertical feet in height, with no climbing of higher ladders or of ropes or scaffolds of any height; she can perform frequent balancing, kneeling, and crouching; she can perform occasional stooping and crawling; she is limited to occasional exposure to extreme cold and heat, and to vibration, moving mechanical parts, and high exposed places; she is limited to workplace exposure up to and including moderate noise; she is limited to unskilled work, which is work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation [('SVP')] and judgment are needed; she is limited to work requiring sustained concentration and persistence for no greater than approximately 2 hours at a time; she is limited to work that is not frequently performed on an assembly line or at a similar production-pace; she is limited to occasional changes to the work setting and the manner and method of performing the assigned work - work that frequently provides for two 15-minute breaks and one 30-minute break for each 8-hour shift worked, occurring at such times as directed by her employer.

. . .

6.   [Plaintiff] is capable of performing past relevant work as a cashier, ([Dictionary of Occupational Titles ('DOT')] #211.462-010), light exertion, performed at the light to medium exertion level, and a[n] SVP of 2; Assistant manager, ([DOT] #185.167-046), light exertion, performed at the medium exertion level, and a[n] SVP of 7.  This work does not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . .

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform, considering [her] age, education, work experience, and residual functional capacity.

3

. . .

[7]. [Plaintiff] has not been under a disability, as defined in the [] Act, from February 21, 2020, through the date of this decision.

(Tr. 14-21 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla

4

of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' _i.e._, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174

---

[1] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.  However, if the

_____

[2]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit, stand and walk when formulating the RFC" (Docket Entry 13 at 4 (bold font and single-spacing omitted));

2) "[t]he structure of the SSA is constitutionally invalid" (id. at 10 (bold font and single-spacing omitted)); and

_____

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

3) "[t]he ALJ's appointment violates the Appointments Clause" (id. at 17 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 16 at 7-34.)

## 1. RFC

In Plaintiff's first issue on review, she asserts that "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit, stand and walk in formulating the RFC." (Docket Entry 13 at 4 (bold font and single-spacing omitted).) In particular, Plaintiff points to her testimony at the hearing regarding the impact of her low back and radicular pain on her abilities to sit, stand, and walk (see id. at 4-5 (citing Tr. 43-44, 49, 52)), as well as "medical evidence supportive of [her] testimony" (id. at 5; see also id. at 5-7 (detailing evidence Plaintiff believes supports greater sitting, standing, and walking limitations in RFC (citing Tr. 352, 357, 369-70, 376, 379, 388, 409, 412-14, 416-17, 419-20, 426-27, 429-30, 432, 437-38, 441-42, 502-03, 663-65, 717, 776, 779-81))), and notes that, "despite th[at] testimony and evidence, the ALJ limited [Plaintiff] to a reduced range of work at the light exertional level with the full range of sitting, standing, and walking required of light work" (id. at 7 (citing Tr. 16)). According to Plaintiff, "the ALJ failed to explain how he arrived at the conclusion that [Plaintiff] could perform sitting, standing, and

9

walking each for up to six hours in an eight-hour workday," and "did not discuss why he apparently felt that [Plaintiff] could maintain such positions for up to 2 hours [sic] intervals, as he assessed no limitations on [Plaintiff]'s ability to maintain each position at one time." (Id. at 9.) Plaintiff contends that "[t]he calculation of frequency of position change (much like the calculation of time off task) can be outcome determinative." (Id. (citing Holland v. Commissioner of Soc. Sec. Admin., Civ. No. 17-1874, 2018 WL 1970745, at *10 (D. Md. Apr. 25, 2018) (unpublished)).)

Plaintiff further faults the ALJ for failing to "explain how he decided which of [Plaintiff]'s statements and evidence to believe and 'which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [Plaintiff's RFC].'" (Id. at 8-9 (quoting Mascio v. Colvin, 780 F.3d 632, 639-40 (4th Cir. 2015)).) In Plaintiff's view, "'[h]aving met [her] threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [she wa]s entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that [her] pain [wa]s so continuous and/or so severe as to prevent [her] from working a full eight hour day.'" (Id. at 10 (quoting Hines, 453 F.3d at 565).) Plaintiff additionally emphasizes that "[t]he [United States Court of Appeals

10

for the] Fourth Circuit . . . in *Dowling* . . . determin[ed] that the ALJ should have specifically addressed the claimant's testimony regarding how long [s]he was capable of sitting, especially in light of a sedentary RFC." (<u>Id.</u> at 9 (citing <u>Dowling v. Commissioner of Soc. Sec.</u>, 986 F.3d 377, 388-89 (4th Cir. 2021)).) Plaintiff ultimately contends that "the case must be remanded for further proceedings" (<u>id.</u> at 10), because "[t]he [VE] was not asked about the impact of [additional] postural limitations at the hearing" (<u>id.</u> at 5 (citing Tr. 58-64)), and "[a] limitation to sedentary [work] would have likely resulted in a finding of disability . . . [under] the Medical[-]Vocational Guidelines" (<u>id.</u> at 10). Those contentions lack merit.

RFC measures the most a claimant can do despite any physical and mental limitations. <u>Hines</u>, 453 F.3d at 562; 20 C.F.R. §§ 404.1545(a), 416.945(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. <u>See Hines</u>, 453 F.3d at 562-63; 20 C.F.R. §§ 404.1545(b), 416.945(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). <u>See</u> 20 C.F.R. §§ 404.1567, 416.967. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. <u>See</u> 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

11

An ALJ need not discuss every piece of evidence in making an RFC determination.  See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014).  However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion."  Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996) ("SSR 98-6p").

The Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand.  See Mascio, 780 F.3d at 636–37.  Specifically, the court stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," id. at 636, but that "'remand may be appropriate

12

where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" id. (internal brackets and ellipsis omitted) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). Here, the ALJ did not expressly assess Plaintiff's abilities to sit, stand, and walk on a function-by-function basis (see Tr. 16-19); however, no basis for remand exists, because the ALJ's decision nevertheless supplies the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and his findings that Plaintiff's "residual effects of lumbar disc surgery with residual degenerative disease and symptoms" (Tr. 15) (A) qualified as a severe impairment at step two of the SEP (see id.), but (B) did not cause limitations greater than the RFC's allowance of up to six hours of sitting, standing, and walking (in no more than two hour intervals generally) in an eight-hour workday (see Tr. 16).

As an initial matter, to the extent Plaintiff intends her contention that she could "rely exclusively on subjective evidence to prove . . . that [her] pain [wa]s so continuous and/or so severe as to prevent [her] from working a full eight hour day'" (Docket Entry 13 at 10 (quoting Hines, 453 F.3d at 565)) to mean that the ALJ erred by considering objective medical evidence in analyzing the intensity, persistence, and limiting effects of Plaintiff's

13

symptoms, such an argument misses the mark. Although the Fourth Circuit recently "reiterate[d ] long-standing [Circuit] law . . . that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020), long-standing cases containing the substance of that holding, such as Craig and Hines (among others), clarify that, "[a]lthough a claimant's allegations about her [symptoms] may not be discredited solely because they are not substantiated by objective evidence of the [symptoms themselves] or [their] severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges she suffers," Craig, 76 F.3d at 595 (emphasis added); see also Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms; however, Arakas, Craig, and Hines do not compel ALJs to consider only subjective evidence, as such a requirement would conflict with the regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 20

14

C.F.R. §§ 404.1529(c), 416.929(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources); see also 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

Here, in compliance with Arakas, Hines, and Craig, the ALJ considered the objective medical evidence as one part of his evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms. (See Tr. 16-19.) As detailed below, the ALJ also considered Plaintiff's "routine care and essentially baseline measure of functioning throughout the relevant period" (Tr. 17; see also Tr. 17-18 (discussing such treatment and functioning)), and the opinion evidence of record (see Tr. 18-19).[5]

---

[5] Plaintiff's complaint that the ALJ utilized a "vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [Plaintiff's RFC]" (Docket Entry 13 at 8-9) also lacks merit. The Mascio court held that an ALJ erred by finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible to the extent they are inconsistent with the [ RFC] assessment," because "th[at] boilerplate gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility." Mascio, 780 F.3d at 639 (emphasis added) (internal footnote and quotation marks omitted). The court noted that "the ALJ [] should
(continued...)

Turning to Plaintiff's assertions regarding the function-by-function analysis, those assertions fall short because the ALJ's evaluation of Plaintiff's subjective symptom reporting elucidates the ALJ's RFC findings regarding Plaintiff's abilities to sit, stand, and walk. In that regard, the ALJ explicitly acknowledged Plaintiff's statements reporting "a history of constant, radiating back pain that required surgical attention," as well as that "her back pain continued after surgery, causing problems getting out of her car" (Tr. 17 (referencing Tr. 42-43)), that she experienced "difficulty cleaning, bending and lifting heavy objects" (id. (referencing Tr. 39)), and that "prolonged standing or sitting for longer than 10 minutes aggravate[d] her condition" (id. (referencing Tr. 44)). The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (id.) and, beyond Plaintiff's meritless assertions under Hines and Mascio (see Docket Entry 13 at 8-10) discussed above, she has not challenged that finding by the ALJ (see id. at 4-10).

The ALJ's evaluation of the opinion evidence provides further support for the sitting, standing, and walking allowances in the

---

[5] (...continued)
have compared [the plaintiff]'s alleged functional limitations from pain to the other evidence in the record, not to [her RFC]." Id. In contrast, the ALJ here did not use the forbidden language in his finding regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms. (See Tr. 17.)

16

RFC.  In particular, the ALJ found the opinions of the state agency medical consultants that Plaintiff remained capable of light work involving up to <u>six hours each of sitting, standing, and walking</u>, "with additional postural and environmental limitations . . . generally <u>consistent</u> with the available evidence at the time [their] opinion[s] w[ere] rendered," but noted that "evidence submitted at the hearing level and [Plaintiff]'s testimony warrant[ed] additional <u>postural</u> limitations than those [] assessed [by the consultants]."  (Tr. 18, 19 (emphasis added).) Consistent with that statement, the ALJ included greater limitations on climbing and crawling in the RFC than the consultants assessed. (<u>Compare</u> Tr. 16, <u>with</u> Tr. 72, 99.)  The ALJ also found a "August 20, 2019 temporary work restriction from Chad Cole, Physician's Assistant [("PA Cole") ] not entirely persuasive," noting that PA Cole's opinion constituted "a pre-alleged onset date restriction."  (Tr. 19.)  In addition, the ALJ expressly found PA Cole's opinion that Plaintiff could perform <u>light</u> work "consistent with the longitudinal record," but deemed PA Cole's "prohibition against any bending or twisting . . . <u>inconsistent</u> with the greater weight of the evidence." (<u>Id.</u> (emphasis added) (citing, inter alia, Tr. 351-91, 437, 441, 663, 717).)

In turn, the ALJ's discussion of Plaintiff's "routine care and essentially baseline measure of functioning throughout the relevant

17

period" (Tr. 17) additionally supports the RFC's allowances for up to six hours of sitting, standing, and walking in a workday, as exemplified by the following observations by the ALJ:

- Plaintiff's "history of conservative care for anemia" showed that, "[a]lthough some occasional low back pain was reported, [Plaintiff] demonstrated no decreased ranges of motion, musculoskeletally." (Id. (citing Tr. 341, 347-48));

- "[T]reatment records from UNC Rheumatology Carolina document [Plaintiff]'s ambulation without [] assistance, slightly reduced strength proximally in [the] arms that was likely attributed to decrease[d effort] with pain, and generally full ranges of motion." (Id. (citing Tr. 396));

- Plaintiff's "consistent pain management for lower back pain" revealed that her "strength and sensation ha[d] been unremarkable" and, although "[a]ntalgic gait ha[d] been noted during most of the pain management evaluations[,] . . . other exams by various other providers have noted no gait abnormality." (Tr. 18 (citing Tr. 453, 457, 605, 641, 671, 689, 737); and

- "[Plaintiff] did endorse the use of assistive devices[, but] . . . the longitudinal record d[id] not indicate any documented use of a cane or walker, or any consistent gait abnormality" and "no indication [existed] that any medical provider ha[d] prescribed a cane or other assistive device post-operatively." (Id.).

For the reasons explained more fully below, Plaintiff's two grounds for attacking the ALJ's evaluation of the medical evidence fall short.

Plaintiff first objects to "the ALJ['s] indicat[ion] that an antalgic gait ha[d] been noted at most of [Plaintiff's] pain management examinations, but that there [we]re other examinations

18

where her gait [wa]s normal so that [the ALJ] c[ould ] not say [Plaintiff's gait wa]s consistently abnormal across the board." (Docket Entry 13 at 8 (citing Tr. 18).) According to Plaintiff:

> The ALJ cites to six locations of supposedly normal examinations. Of those, one appears to be a telemedicine visit where gait was not observed. [(Tr. 605.)] Three others were from [Plaintiff]'s hematologist, who ha[d] been treating her only for anemia and related concerns. [(Tr. 672, 689, 738.)] Another citation was for a visit where [Plaintiff's] primary treatment was for her hypertension. [(Tr. 636, 642.)] Only the February 17, 2020, visit was primarily for her back pain, and even then she was encouraged to contact her pain management for follow-up should her pain not improve. [(Tr. 453, 457.)] In short, it appears that the record documents gait disturbance at nearly every visit where [Plaintiff] was actually being treated for her lumbar spine and such observation was relevant.

(Docket Entry 13 at 8 (first internal citation omitted).)

Plaintiff's above-quoted contentions improperly minimize the observations of Plaintiff's treating physicians as to her gait and overemphasize the relevance of the gait findings of her pain management physician's assistant. Although the ALJ's citation to page 605 of the administrative transcript does reference a telemedicine visit with Plaintiff's rheumatologist, Dr. Alfredo Carlos Rivadeneira, on May 21, 2020, which does not reflect a gait assessment (see Tr. 603-10), the remaining citations reflect observations of normal gait by Plaintiff's treating providers throughout the relevant period in this case (see Tr. 18 (citing Tr. 453-57 (2/17/20 visit with primary care provider Todd Nicholson, PA ("PA Nicholson")), 636-42 (6/2/20 treatment record with PA

19

Nicholson), 667-74 (6/29/20 visit with hematologist Dr. Charles Kuzma), 684-97 (12/29/20 treatment with Dr. Kuzma), 730-43 (9/18/20 office visit with PA Nicholson))). Plaintiff provides no authority to support her contention that Dr. Kuzma and PA Nicholson lacked sufficient qualifications to make findings about a basic and observable phenomenon such as her gait. (See Docket Entry 13 at 8.)[6] Moreover, the ALJ expressly explained why he found less persuasive the notations of "moderately antalgic" gait contained in identical examination findings in all of Plaintiff's pain management visits (Tr. 409, 412, 416, 419, 422, 426, 429, 432, 437, 441, 663, 776, 779 (bold font omitted)): "lumbar spine inspection revealed normal alignment, no deformity, no tenderness, no warmth and no masses[, and Plaintiff]'s hips were noted as stable, and her strength findings were 5/5 in every quadrant" (Tr. 18 (emphasis added)).

Second, Plaintiff faults the ALJ's statement that [Plaintiff] "had 'occasional back pain' and that she ha[s] reported no reduced ranges of motion" (Docket Entry 13 at 8 (quoting Tr. 17)), arguing that "[Plaintiff] consistently reported constant lumbar pain and consistently had a grossly limited range of motion in her lumbar spine upon examination" (id.). Plaintiff takes the ALJ's remarks out of context. The ALJ correctly observed that Plaintiff reported

_____

[6] Indeed, Plaintiff's objection on this front misses the ALJ's basic point: Plaintiff walked normally except when seen for pain management. That difference in her behavior provides a basis to discount the pain-management-specific behavior as representative of Plaintiff's symptom profile.

"some occasional low back pain," but "demonstrated no decreased ranges of motion, musculoskeletally" in connection with her treatment with hematologist Dr. Kuzma. (Tr. 17 (citing Tr. 343, 347, 348).) Elsewhere, the ALJ noted that Plaintiff's rheumatology providers found "generally full ranges of motion" (id. (citing Tr. 396, 617 (duplicate copy of same exam))). Although the ALJ did not expressly mention the findings of "grossly limited" lumbar range of motion "with pain" replicated verbatim in all of Plaintiff's pain management visits (see Tr. 18; see also Tr. 409, 413, 417, 420, 423, 427, 430, 432, 438, 441, 663, 776, 779 (bold font omitted)), as discussed above, the ALJ acknowledged that those examinations "d[id] indicate lower back pain" and "[a]ntalgic gait" (Tr. 18). Moreover, the ALJ also noted the repeated findings of full lower extremity strength, normal sensation, and no lumbosacral tenderness. (See id.)

Moreover, by pointing to record evidence Plaintiff believes supports greater limitations on her abilities to sit, stand, and walk, she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's finding regarding Plaintiff's abilities to sit, stand, and walk, and not whether other record evidence weighed against that finding, see Lanier v.

21

Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Additionally, the evidence Plaintiff cites in support of her instant contentions (see Docket Entry 13 at 4-7 (citing Tr. 43-44, 49, 52, 352, 357, 362, 369-70, 376, 379, 388, 409, 412-14, 416-17, 419-20, 426-27, 429-30, 432, 437-38, 441-42, 502-03, 663-65, 717, 776, 779-81)) would not have compelled the ALJ to adopt greater sitting, standing, or walking limitations in the RFC. Some of that evidence reflects Plaintiff's subjective reports of pain and/or difficulty sitting, standing, or walking (see id. at 4-7 (citing Tr. 43-44, 49, 52, 441-42, 663-65, 717, 776, 779-81)), which the ALJ discounted (see Tr. 17), in a manner which (for reasons discussed above) withstands Plaintiff's challenges (see Docket Entry 13 at 8-10). Other evidence predates the relevant period in this case (see id. at 5-6 (citing Tr. 352 (9/4/19), 357 (8/20/19), 362 (6/18/19), 369-70 (5/21/19), 376 (4/22/19), 388 (5/30/19), 409 (2/15/19), 412-14 (4/25/19), 416-17 (5/2/19), 419-20 (6/12/19), 426-27 (8/14/19), 429-30 (10/10/19), 432 (12/11/19), 437-38 (2/5/20), 502-03 (1/16/19)) and, even more significantly, precedes Plaintiff's lumbar surgery in May 2019 (see id. at 5 (citing Tr. 369-70 (5/21/19), 376 (4/22/19), 409 (2/15/19), 412-14 (4/25/19),

22

416-17 (5/2/19), 502-03 (1/16/19))). Plaintiff's lumbar spine MRI on August 31, 2019, indicated a left hemilaminotomy defect at L5-S1 with scarring or a disc protrusion abutting the descending S1 nerve root (see Tr. 379), which supports the ALJ's finding that Plaintiff's lumbar spine condition qualified as a severe impairment (see Tr. 15) that limited Plaintiff to light work with additional postural restrictions (see Tr. 16) but does not address Plaintiff's abilities to sit, stand, or walk.[7]  The remainder of that evidence constitutes Plaintiff's pain management visits during the relevant period (see Docket Entry 13 at 6-7 (citing Tr. 441-42 (4/1/20 pain management note reflecting moderately antalgic gait and grossly limited lumbar range of motion with pain but normal strength, sensation, pulses, reflexes, and hip range of motion), 663-65 (6/25/20 pain management note with identical findings), 717 (same, dated 8/24/20), 776 (same, dated 10/19/20), 779-81 (same, dated 12/16/20))) which, for the reasons discussed above, the ALJ discussed but did not find warranted greater limitations in the RFC (see Tr. 18).

Finally, Plaintiff has not shown that the ALJ's decision violated Dowling.  In that case, the plaintiff "argued throughout her administrative and judicial proceedings that her [inflammatory bowel disease] and anal fissure caused her to experience discomfort when she s[at] for a prolonged period of time."  Dowling, 986 F.3d

---

[7] Although the MRI predates the relevant period, it constitutes the most recent imaging of Plaintiff's lumbar spine in the record.

at 388 (emphasis added). In contrast, here, the record entirely lacks such consistent complaints of difficulty sitting by Plaintiff. Although in her hearing testimony (see Tr. 44) and a Function Report submitted to the SSA (see Tr. 279, 284), Plaintiff claimed a decreased ability to sit due to pain, the ALJ discounted Plaintiff's subjective symptom reporting (see Tr. 17) and, as explained *supra*, Plaintiff has not demonstrated error with respect to that finding. Moreover, the treatment records during the relevant period reflect that Plaintiff reported to Dr. Rivadeneira on December 9, 2020, that her lower back and radicular pain caused her difficulty getting out of her bed and her car, but did not mention difficulty sitting (see Tr. 336), and she made no other reports of difficulty sitting (see Tr. 441-43, 452-57, 604-10, 636-42, 663-65 (reporting pain "with activity"), 667-74, 684-97, 717-19 (reporting pain "with activity"), 730-43, 776-78 (reporting pain "with activity"), 779-81).

In light of the foregoing analysis, the Court should deny relief on Plaintiff's first assignment of error.

## 2. Constitutionality of SSA

In Plaintiff's second issue on review, she contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 13 at 10 (bold font omitted).) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single

individual who serves for a longer term than the President and can only be removed from his position for cause." (Id. (citing Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ___, ___, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (Id. (citing 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner] Andrew Saul and is therefore constitutionally defective" (id. at 11 (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ's decision must [] be vacated because he did not have the authority to hear or decide the case given the delegation of authority from [] Commissioner [Saul] who had no constitutional authority to head the [SSA]." (Id.) Those arguments ultimately fail as a matter of law.

As an initial matter, the Commissioner concedes "that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 16 at 27 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure

Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).)
However, the Commissioner notes that, "even where an
unconstitutional statutory removal restriction exists, a plaintiff
seeking relief on that basis must show that the restriction
actually caused her harm." (Id. (citing Collins v. Yellen, ___
U.S. ___, ___ - ___, 141 S. Ct. 1761, 1787-89 (2021)).) According
to the Commissioner, "Plaintiff's separation of powers argument
does not entitle her to a rehearing of her disability claim,"
because she "cannot show the required nexus between the removal
restriction she challenges and the denial of her benefits claim."
(Id. (initial capitals, bold font, and single-spacing omitted).)
For the reasons that follow, the Commissioner's argument has merit.

Plaintiff first maintains that "th[e] type of causation
[argued by the Commissioner] is not required in a case such as this
one which involves government actors exercising power which they
did not lawfully possess" (Docket Entry 13 at 15 (citing Collins,
___ U.S. at ___, 141 S. Ct. at 1788)) and that, in such cases, "an
individual need not show direct prejudice to their disability claim
and instead such harm is presumed" (id. (citing Probst v. Saul, 980
F.3d 1015, 1023 (4th Cir. 2020))). Plaintiff points out that
"[t]he [c]ourt [in Collins] indicated that harm could not be
presumed . . . because [that case] did not involve a government
actor's exercise of power that the government actor did not

26

lawfully possess." (Id. (citing Collins, ___ U.S. at ___, 141 S. Ct. at 1788).)

Plaintiff's attempt to read into Collins a presumption of harm, as well as her reliance on Probst (see id.), an Appointments Clause case where the court found unconstitutional the very authority under which a government official acted, see Probst, 980 F.3d at 1023, both fail for the same reason: the unconstitutional removal provision at issue here did not impact then-Commissioner Saul's ability to carry out the duties of the office, see Collins, ___ U.S. at ___, 141 S. Ct. at 1789 (requiring showing that "unconstitutional provision [] inflict[ed] compensable harm"); see also Decker Coal Co. v. Pehringer, 8 F.4th 1123, 1137 (9th Cir. 2021) ("Collins is controlling with respect to the remedy for any unconstitutionality in the removal provisions."). As another court recently explained:

> [The p]laintiff's argument is similar to arguments the plaintiffs raised and the [United States Supreme] Court rejected in Seila Law and Collins. First, like the plaintiffs in Seila Law, [the p]laintiff here argues § 902(a)(3)'s removal provision automatically renders all agency action unconstitutional. The [Supreme] Court in Seila Law rejected such an argument[,] observing one section of a statute may violate the Constitution without rendering the entire act void. Seila Law, 140 S. Ct. at 2209. The [Supreme] Court stated the removal limitation of the CFPB Director is the only defect and removal of the defect removes the constitutional violation. The [Supreme] Court concluded the removal limitation was severable because the CFPB is capable of functioning independently of the infirm removal clause. Id. [] ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are

capable of functioning <u>independently</u>, and there is
nothing in the text or history of the Dodd-Frank Act that
demonstrates Congress would have preferred no CFPB to a
CFPB supervised by the President."); <u>see also</u> [<u>id.</u>] at
2245.

. . .

The Supreme Court in <u>Collins</u> also rejected the argument
an invalid removal provision rendered the [Federal
Housing Finance Agency ('FHFA')]'s actions void from the
outset. The Supreme Court stated there was "no reason to
hold that the third amendment [to the agreement between
the FHFA and the Department of Treasury] must be
completely undone." <u>Collins</u>, [141 S. Ct.] at 1788. The
<u>Collins</u> Court further stated "[a]lthough the statute
unconstitutionally limited the President's authority to
remove the confirmed Directors, <u>there was no
constitutional defect in the statutorily prescribed
method of appointment to that office</u>. As a result, there
is no reason to regard any of the actions taken by the
FHFA [challenged on appeal] as void." [<u>Id.</u>] at 1787.
Accordingly, the argument the SSA's actions here are
either void *ab initio* or became void at some later point
due to § 902(a)(3)'s removal clause is not supported by
either <u>Seila Law</u> or <u>Collins</u>.

<u>Lisa Y. v. Commissioner of Soc. Sec.</u>, 570 F. Supp. 3d 993, 1002-03,

(W.D. Wash. 2021) (emphasis added) (internal footnote, citation,

and stray parenthesis and period omitted); <u>see also</u> <u>Robinson v.</u>

<u>Kijakazi</u>, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27,

2021) (unpublished) ("[The p]laintiff . . . simply argues that all

actions taken by the Commissioner are void due to the

unconstitutional removal provision. However, <u>Collins</u> expressly

rejects this view." (internal citation omitted)), <u>aff'd</u>, No. 21-

2258, Docket Entry 12 (4th Cir. Jan. 5, 2023) (unpublished)

(holding that the plaintiff's "challenge to the constitutionality

of the ALJ's appointment lacks merit").

28

Plaintiff additionally contends that, "[e]ven if a causal connection between the government's violation of the Constitution and Plaintiff's injuries were required, Plaintiff has still satisfied that requirement." (Docket Entry 13 at 15.) In that regard, Plaintiff asserts that, "'but for' the unlawful delegation of authority to this ALJ, he could not have adjudicated this case and issued the adverse determination," and that "[i]t is impossible to have a more direct 'but for' proof of causation than this." (Id.)

Plaintiff's actual harm argument relies on the same faulty premise as his presumed harm argument, i.e., that the unconstitutional removal provision applying to then-Commissioner Saul (or current Acting Commissioner Kijakazi) necessarily nullified the power to delegate authority to the ALJ to make a decision in Plaintiff's case. Neither Seila Law nor Collins support that position. See Collins, ___ U.S. at ___, 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the FHFA Director of the power to undertake the other responsibilities of his office." (emphasis added)); see also Seila Law, 591 U.S. at ___, 140 S. Ct. at 2209 ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently . . . ." (emphasis added)). Plaintiff has not provided the Court with any

29

basis on which to distinguish Seila Law or Collins with regard to a showing of actual harm. (See Docket Entry 13 at 10-17.)

Moreover, cases that have found a "redressable" or "traceable" injury arising from the unconstitutionality of Section 902(a)(3) have done so only in the context of deciding, as a preliminary matter, whether the plaintiff had standing to assert his or her Seila Law/Collins-based claim and did not address the ultimate merits of the claim. See Dixie C. v. Kijakazi, No. 3:21CV764, 2021 WL 4822838, at *6 (N.D. Tex. Sept. 20, 2021) (unpublished) ("[B]ecause [the p]laintiff has established both traceability and redressability for the purposes of standing, the [c]ourt has standing to hear [the p]laintiff's constitutional claim." (emphasis added)), recommendation adopted, 2021 WL 4820764 (N.D. Tex. Oct. 15, 2021) (unpublished); Sylvia A. v. Kijakazi, No. 5:21CV76, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021) (unpublished) ("The [c]ourt finds that [the p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it. Thus, all of [the p]laintiff's claims should proceed to briefing on the merits." (emphasis added)), recommendation adopted, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021) (unpublished); Albert v. Kijakazi, No. 1:21CV4, 2021 WL 3424268, at *5 (D. Alaska Aug. 5, 2021) (unpublished) ("Because [the] plaintiff has standing to bring his constitutional claim, [the Commissioner]'s motion to dismiss is denied." (emphasis added)); Tafoya v. Kijakazi, No. 21CV871, 2021

30

WL 3269640, at *3 (D. Colo. July 29, 2021) (unpublished) ("While ultimately, the righteousness *vel non* of [the plaintiff's] arguments on the merits may gain [her] little, if anything, the question presently before [the court] is one of <u>standing</u>, and thus does not implicate the merits." (footnote omitted) (emphasis added)).[8]

Indeed, in two such cases, the courts expressed doubt that the plaintiffs' <u>Collins</u>-based claims could succeed on the merits:

> The outcome of <u>Collins</u> is even less auspicious for [the] plaintiff's substantive claim. The [Supreme] Court there rejected the appellant's argument that the actions of the Director of the FHFA of which appellant complained were void:
>
>> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily

---

[8] Cases exist to the contrary on the standing issue. <u>See</u> <u>Helms v. Commissioner of Soc. Sec.</u>, No. 3:20CV589, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021) (unpublished) ("The [c]ourt finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected [the] ALJ[ ]'s decision or any other aspect of the administrative litigation in a material way. Because [the p]laintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality."); <u>Catherine J.S.W. v. Commissioner of Soc. Sec.</u>, No. 3:20CV5602, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021) (unpublished) ("Because [the p]laintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner [Andrew] Saul, . . . the [p]laintiff's situation is distinguishable from the plaintiff's claims in <u>Collins</u>; [the p]laintiff has failed to establish standing . . . ."); <u>Amanda B. v. Commissioner, Social Security Administration</u>, No. 3:20CV434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) (unpublished) ("[The p]laintiff . . . does not allege the SSA Commissioner took any action that is in any way related to the ALJ's decision or the decision by the Appeals Council."); <u>Brinkman v. Kijakazi</u>, No. 2:21CV528, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) (unpublished) ("Because [the p]laintiff offers nothing that traces the decision by the ALJ . . . to any alleged injurious conduct by the SSA Commissioner, [the plaintiff] has not demonstrated traceability and her constitutional violation claim fails for lack of standing.").

31

> > prescribed method of appointment to that
> > office.
>
> Collins, 141 S. Ct. at 1787 (emphases in original).
> Accordingly, "the unlawfulness of the removal provision
> does not strip the Director of the power to undertake the
> other responsibilities of his office," including
> implementing the provision of which the appellant
> complained. Id. at 1788 n.23. It thus may well be that,
> even if the removal provisions of the [] Act are
> unconstitutional, the [SSA]'s ALJs still had authority to
> issue disability determinations.

Tafoya, 2021 WL 3269640, at *3 n.6; see also Dante v. Saul, Civ.

No. 20-702, 2021 WL 2936576, at *5 (D.N.M. July 13, 2021)

(unpublished) ("Th[e] rationale [in Collins] appears to undermine

[the p]laintiff's position that the Commissioner acted outside his

constitutional authority when he delegated authority to the ALJ to

decide [the p]laintiff's disability claim. But, curiously, the

[Supreme] Court's analysis in Collins also supports a finding that

[the p]laintiff has standing to assert a constitutional claim under

this now-questionable theory." (italics omitted, underscoring

added)). Thus, cases decided in the standing context do not

provide a basis for the Court to find actual harm to Plaintiff

arising from Section 902(a)(3)'s removal provision. See Collins,

___ U.S. at ___, 141 S. Ct. at 1788 n.24 ("What we said about

standing in *Seila Law* should not be misunderstood as a holding on

a party's entitlement to relief based on an unconstitutional

removal restriction.").

Plaintiff next attempts to show actual harm by asserting "that

President Biden wished to terminate [then-]Commissioner Saul

immediately upon assuming the Presidency," and that "the White House [] affirmatively and immediately sought advice from [the] DOJ as to whether President Biden could fire [then-]Commissioner Saul after the Supreme Court issued its decision in *Collins*." (Docket Entry 13 at 15-16 (citing 2021 OLC Op., 2021 WL 2981542, at *1).) Plaintiff also notes that "[t]he day after [the] DOJ issued [the 2021 OLC Op.] in the wake of *Collins* confirming that [then-Commissioner] Saul could be removed from office by the President, President Biden immediately did so." (<u>Id.</u> at 16 (citing <u>Tafoya</u>, 2021 WL 3269640, at *3).) Plaintiff additionally relies on an online article on the Federal News Network website which quotes a statement from an unidentified "White House official" regarding the dismissal of then-Commissioner Saul, indicating that he "'ha[d] undermined and politicized Social Security disability benefits'" and "'reduced due process protections for benefits appeals hearings.'" (<u>Id.</u> (citing https://federalnewsnetwork.com/people/ 2021/07/biden-fires-saul-as-ssa-commissioner (July 9, 2021)).) Plaintiff thus argues that "President Biden's concerns about [then-Commissioner] Saul's policy actions went to the very fundamentals of the entire disability adjudication process." (<u>Id.</u> at 17.) In Plaintiff's view, given that President Biden believed then-Commissioner Saul had undermined due process "'[s]ince taking office' in 2019" (<u>id.</u> at 16 (quoting https://federalnews network.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)),

33

and that "President Biden [] immediately remov[ed] then-Commissioner] Saul from office the day after [the] DOJ issued [the 2021 OLC Op.,] . . . it is unmistakable that President Biden would have fired [then-]Commissioner Saul immediately upon taking office had [President Biden] believed it was legal" (id. at 16-17; see also id. at 17 n.4 (pointing out that "the [Supreme] Court indicated in *Collins* that[,] in a situation where 'the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way[,] . . . the statutory provision would **_clearly_** cause harm'" (quoting *Collins*, ___ U.S. at ___, 141 S. Ct. at 1789 (underscoring added) (bold font and italics supplied by Plaintiff) (some brackets omitted)), and noting that "the ALJ who denied Plaintiff's [claim] made his decision on March 3, 2021 pursuant to delegations of authority from [then-Commissioner] Saul, with whom the President was displeased and [whom the President] would have likely dismissed but for the unconstitutional removal protections" (internal parenthetical citation omitted))).  That argument misses the mark.

Although Plaintiff relies on an unidentified White House official's statement expressing dissatisfaction with then-Commissioner Saul's performance since he took office in 2019 (id. at 16 (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff fails to point to

34

any actual facts demonstrating that President Biden wished to
remove then-Commissioner Saul (let alone attempted to remove him
and failed to do so as a result of Section 902(a)(3)), prior to the
date on which the ALJ denied Plaintiff's claim (March 3, 2021) (see
id. at 15-17).  Moreover, beyond a vague reference to a reduction
in unidentified "'due process protections for benefits appeals
hearings'" (id. at 16 (quoting https:// federalnewsnetwork.com/
people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff
has failed to show how President Biden's alleged inability to
remove then-Commissioner Saul actually impacted the adjudication of
Plaintiff's claim for benefits.  As explained by another district
court:

> In her reply brief, [the p]laintiff argues "[then-
> Commissioner] Saul's actions, under constitutional
> authority or not, have caused specific harm by
> undermining, politicizing and reducing due process
> protections to [the p]laintiff's claims."  This argument
> that there is a possibility § 902(a)(3) harmed [the
> p]laintiff fails to recognize the significant difference
> between the agency action in Collins and the SSA action
> here.
>
> In Collins, the Directors of the FHFA adopted an
> amendment (the "Third Amendment") to certain financial
> agreements that "materially changed the nature of the
> agreements" and resulted in the companies in which [the]
> plaintiffs were shareholders transferring to the U.S.
> Treasury "at least $124 billion dollars more than the
> companies would have had to pay" under the prior form of
> the agreements.  Id. at 1774.  The plaintiffs in Collins
> thus had an identifiable basis to contend that[,] but for
> the unconstitutional removal provision, the President may
> have removed and appointed a different Director who would
> have disapproved of the adoption (or implementation) of
> the Third Amendment.  See id. at 1789.

35

> In contrast, there is nothing showing the Commissioner or
> the SSA implemented new and relevant agency action that
> may have turned upon the President's inability to remove
> the Commissioner. <u>[The p]laintiff has not identified any
> new regulations, agency policies or directives [then-
> ]Commissioner Saul installed that may have affected her
> claims.</u> [The p]laintiff thus fails to show how or why
> § 902(a)(3)['s] removal clause possibly harmed her.

<u>Lisa Y.</u>, 570 F. Supp. 3d at 1003 (emphasis added) (internal

citation omitted); <u>see also</u> <u>id.</u> at 1004 ("[A] conclusory allegation

that due process was denied is not sufficient to raise a colorable

constitutional claim." (citing <u>Hoye v. Sullivan</u>, 985 F.2d 990, 992

(9th Cir. 1992))); <u>Shaun A. v. Commissioner of Soc. Sec.</u>, Civ. No.

C21-5003, 2021 WL 5446878, at *5 (W.D. Wash. Nov. 22, 2021)

(unpublished) ("[The p]laintiff's reference to an unnamed White

House official's justification for [then-]Commissioner Saul's

removal [does not] indicate that [the p]laintiff was harmed. . . .

Although a representative of the President suggested that [then-

]Commissioner Saul was removed from office in part because he had

undermined, politicized, and 'reduced due process protections for

benefits appeals hearings,' this statement does not establish the

existence of a due process violation and [the p]laintiff has failed

to identify one."). Similarly, Plaintiff here has not pointed the

Court to any "new regulations, agency policies or directives [then-

]Commissioner Saul installed that may have affected her claims,"

<u>Lisa Y.</u>, 570 F. Supp. 3d at 1003. (<u>See</u> Docket Entry 13 at 10-17.)

In short, Plaintiff's constitutional claim based on <u>Seila Law</u>

and <u>Collins</u> lacks merit.

36

### 3. Appointments Clause

Plaintiff's third assignment of error maintains that "[t]he ALJ's appointment violates the Appointments Clause" of the U.S. Constitution. (Docket Entry 13 at 17 (bold font omitted) (referencing U.S. Const. art. II, § 2, cl. 2).) In particular, Plaintiff contends that "[t]he ALJ's appointment by Nancy Berryhill on July 16, 2018, violates the Appointments Clause because Nancy Berryhill was no longer the Acting Commissioner on that date and, therefore, lacked the authority to ratify the ALJ's appointment." (Id. (internal parenthetical citation omitted).) According to Plaintiff, Berryhill "became Acting Commissioner of SSA on January 20, 2017, when President Donald Trump assumed office and then[-]Acting Commissioner Carolyn Colvin resigned." (Id. (citing U.S. Gov't Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998–Commissioner, Social Security Administration," www.gao.gov/assets/700/690502.pdf, at 1 (Mar. 6, 2018) ("GAO Notice")).) Plaintiff points out that, "[o]n March 6, 2018, the GAO [Notice] reported that Berryhill's service as Acting Commissioner under the [Federal Vacancies Reform Act ('FVRA')] had expired on November 16, 2017, and that her service after that date violated the FVRA." (Id. at 18 (citing GAO Notice, at 2).) Plaintiff thus argues that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective because her period of acting

37

service had expired on November 16, 2017, and the FVRA did not allow her to resume acting as Commissioner at a later date." (Id. (citing Brian T.D. v. Kijakazi, 580 F. Supp. 3d 615, 629 (D. Minn. 2022), appeal filed sub nom Dahle v. Kijakazi, No. 22-1601 (8th Cir. Mar. 22, 2022).) Plaintiff's argument falls short.

a. The FVRA

Resolution of Plaintiff's second issue on review turns on interpretation of the FVRA, which:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required. 5 U.S.C. § 3345 et seq. The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Id. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers. Id. § 3345(a)(2)– (a)(3). . . . The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency. Id. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," id. § 3348(d)(1), and any such action "may not be ratified," id. § 3348(d)(2).

Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs., 496 F. Supp. 3d 31, 53 (D.D.C. 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

38

The specific provision of the FVRA at issue in this case, governing the time limits on serving in an acting capacity under the FVRA, provides as follows:

(a) . . . the person serving as an acting officer as described under section 3345 may serve in the office–

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

b.   Factual Background

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. See "Memorandum Providing an

39

Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. See GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired on November 16, 2017. See GAO Notice, at 2.[9] Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO. See Patterson v. Berryhill, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished). On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA interpreted as permitting Berryhill to resume serving as Acting Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision. See Reuter v. Saul, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), recommendation adopted, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

---

[9]  The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017). 5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017 constituted the 300th day after the January 20th inauguration.

On June 21, 2018, the United States Supreme Court issued <u>Lucia v. Securities & Exh. Comm'n</u>, 585 U.S. ___, 138 S. Ct. 2044 (2018), which held, based on its prior case <u>Freytag v. Commissioner of Int. Rev.</u>, 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions." <u>Lucia</u>, 585 U.S. at ___, 138 S. Ct. at 2053 (internal quotation marks omitted).[10] Because the SEC ALJ who decided the plaintiff's case lacked "the kind of appointment the [Appointments] Clause requires," i.e., appointment by the "President alone," "the Courts of Law," or "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2, the Supreme Court "held that the appropriate remedy for an adjudication tainted with an appointments violation [wa]s a new hearing before a [different,] properly appointed official." <u>Id.</u> at ___, 138 S. Ct. at 2055 (internal quotation marks omitted).

Although "[<u>Lucia</u>] did not specifically address the constitutional status of ALJs who work in . . . the [SSA, t]o

---

[10]  The Appointments Clause provides as follows:

> [The President of the United States] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

41

address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the [DOJ], on July 16, 2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security." Id.

c.  Brian T.D.

Plaintiff primarily relies on the reasoning in Brian T.D. to support her argument that Berryhill lacked authority under the FVRA to ratify the appointments of the SSA's ALJs on July 16, 2018. (See Docket Entry 13 at 18 (citing Brian T.D., 580 F. Supp. 3d at 631-35).)  In that case, the court concluded that, because "Section 3346(a) [of the FVRA] applies to 'the person serving as an acting officer,'" Brian T.D., 580 F. Supp. 3d at 629 (emphasis added) (quoting 5 U.S.C. § 3346(a)), and because, "[w]hen Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner," id. (emphasis added), "by its plain language, § 3346(a)(2) d[id] not apply to Berryhill," id.; see also id. (stating that "[c]ourts have frequently looked to Congress' choice of verb tense to interpret statutes," and that, "[w]hen a [c]ourt is determining the meaning of an Act of Congress,

42

Case 1:21-cv-00807-LCB-LPA   Document 17   Filed 02/23/23   Page 42 of 67

the present tense generally does not include the past" (citing <u>Carr</u> <u>v. U.S.,</u> 560 U.S. 438, 447 (2010) (in turn, citing the Dictionary Act, 1 U.S.C. § 1))).

The <u>Brian T.D.</u> court thereafter provided further interpretations of the FVRA that purportedly supported its above-described conclusion regarding Section 3346(a)(2)'s inapplicability to Berryhill, including that:

- "[s]ubsection [3346](b)(1) states that if a nomination is rejected, withdrawn, or returned, 'the person may **continue to serve** as the acting officer for no more than 210 days[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(1)), and "[s]ubsection [3346](b)(2) states that if a second nomination is unsuccessful, 'the person **serving** as the acting officer may **continue to serve**[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(2));

- "[section] 3348 [of the FVRA] confirms [<u>Brian T.D.</u>'s] reading[ of Section 3346(a) because, u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete," <u>id.</u> at 630 (quoting 5 U.S.C. § 3348(b)(1) & (2)); <u>see also</u> <u>id.</u> at 631 ("[t]o accept [the Commissioner]'s interpretation of § 3346(a)(2) would require the Court to ignore (or rewrite) § 3348");

- the Commissioner's interpretation of Section 3346(a) as "allow[ing] Berryhill to resume acting as Commissioner (that is, to spring back into that position) when President Trump nominated Saul, even though her initial statutory term had expired . . . misreads the statutory language[, because t]he word 'or' modifies the entire provision that limits the acting officer to a period 'no longer than' 210 days from the date the vacancy arose[ and, t]hus, when read with the entirety of subsection [3346](a)(1)[,] 'or' serves to suspend that time limitation, not to create an

43

entirely separate and distinct period of service," id. (some internal quotation marks omitted) (quoting 5 U.S.C. § 3346(a)(1)).

For the reasons more fully explained below, the Court should decline to follow the reasoning of Brian T.D. and conclude that Berryhill properly served as Acting Commissioner under the spring-back provision of Section 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs in July 2018.

d. Analysis

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985); however, in construing the text of the FVRA, Brian T.D. misconstrues Congress's use of the present tense verb "serving" in Section 3346(a)(1), Brian T.D., 580 F. Supp. 3d at 629. In that regard, the court noted that "Congress, in enacting § 3346, used the present participle 'serving,' rather than the past or present perfect 'served' or 'has served'" and thus that "Section 3346(a) . . . applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner." Id. (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served' or 'has served'" to set out the time limits for acting officials under the FVRA would not make

44

sense.  Had Congress drafted Section 3346(a) to provide that "the person [who served or who has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time limits only for individuals who had already served as acting officers, which renders the time limits nonsensical.  See United States v. Turkette, 452 U.S. 576, 580 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); see also Sorrells v. United States, 287 U.S. 435, 447 (1932) ("All laws should receive a sensible construction.  General terms should be so limited in their application as not to lead to . . . an absurd consequence."); Harris v. United States, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided").

Construing the phrase "the person serving as an acting officer as described under section 3345," 5 U.S.C. § 3346(a) (emphasis added), as merely descriptive, i.e., as explaining that the time limits apply to acting officers under Section 3345 of the FVRA, as opposed to acting officers under other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a).  See Snyder v. Kijakazi, No. 21CV103, 2022 WL 4464847, at *19 (N.D. Iowa Sept. 26, 2022) (unpublished) ("[T]he language at 5 U.S.C. § 3346 is in the present

45

tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA."), appeal filed, No. 22-3455 (8th Cir. Nov. 29, 2022); Sidney M. v. Kijakazi, No. 21CV2034, 2022 WL 4482859, at *16 (N.D. Iowa Sept. 26, 2022) (unpublished) ("[R]eference to 'the person serving as acting officer' refers to who may serve generally under § 3345 and [] there is no requirement that the person be currently serving to serve under subsection (a)(2). The phrase 'the person serving as an acting officer' applies equally to subsection (a)(1) and it would be nonsensical for the statute to allow a person to serve on 'the date the vacancy occurs' while also requiring that person to be presently serving as an acting officer. There cannot be a vacancy and a 'person serving as an acting officer' at the same time."); Bauer v. Kijakazi, No. 21CV2008, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022) (unpublished) (deeming it "[s]ignificant[]" that "the active verb in § 3346(a) is not serving, but 'may serve,'" and thus finding that "'serving' is used to refer back to [S]ection 3345, which sets out who may serve as an acting officer"); Lance M. v. Kijakazi, No. 2:21CV628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022) (unpublished) ("When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of 'present service.' Instead, it constrains section 3346(a)'s scope to individuals whose authority

46

stems from the FVRA."), <u>recommendation adopted</u>, 2022 WL 3007588 (E.D. Va. July 28, 2022) (unpublished).

Moreover, as the Commissioner argues:

> Reading § 3346(a)'s prefatory phrase to limit that subsection's application to only "the person presently serving in [an acting] capacity," <u>Brian T.D.</u>, [580 F. Supp. 3d at 629], would also create an irreconcilable conflict with § 3345. Under the FVRA, the default rule is that the first assistant automatically becomes the acting official, but the President can subsequently displace the first assistant from her acting role by choosing another acting official. *See* 5 U.S.C. § 3345(a)(1)-(3); *see also Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019). But if § 3346(a) applied only to a "presently serving" acting officer, it would incorrectly bar the President from designating an alternative acting official. Were the President to designate an acting official after the first assistant had assumed the role by default, the alternative official would not be the person *presently* "serving as an acting officer as described under section 3345." Under the *Brian T.D.* court's misinterpretation of that phrase, § 3346(a) thus would not permit her to serve *at all* because § 3346(a)'s prefatory phrase applies to service under both § 3346(a)(1) and (a)(2). By the same token, were a first assistant serving as an acting official to die, resign, or otherwise be unable to serve during the vacancy, the President would be incapable of replacing her.

(Docket Entry 16 at 20-21.) The Court should construe the meaning of the word "serving" in Section 3346(a) in a manner that does not create inconsistencies with other provisions of the FVRA. See <u>NLRB v. Wheeling Electric Co.</u>, 444 F.2d 783, 787 (4th Cir. 1971) ("The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect . . . and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd

47

result, courts must look beyond the plain words of the statute."
(citations omitted)); <u>Milan Puskar Health Right v. Crouch</u>, 549 F.
Supp. 3d 482, 490 (S.D.W. Va. 2021) ("[T]he [c]ourt . . . is
obligated to avoid statutory interpretations that lead to
absurd . . . results if 'alternative interpretations consistent
with the legislative purpose are available.'" (quoting <u>Griffin v.</u>
<u>Oceanic Contractors, Inc.</u>, 458 U.S. 564, 575 (1982))).

The <u>Brian T.D.</u> court next found that the "structure and
context" of Section 3346 supported the court's interpretation of
Section 3346(a)(2) as not applying to Berryhill. <u>Brian T.D.</u>, 580
F. Supp. 3d at 629. In support of that finding, the court noted
that:

> [s]ubsection (b)(1) states that if a nomination is
> rejected, withdrawn, or returned, "the person may
> **continue to serve** as the acting officer for no more than
> 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added).
> Subsection (b)(2) states that if a second nomination is
> unsuccessful, "the person **serving** as the acting officer
> may **continue to serve**." <u>Id.</u> § 3346(b)(2) (emphasis
> added). Therefore, the plain language of § 3346,
> indicates that the use of the present participle is
> deliberate — only a person presently serving may continue
> to serve. The plain language of § 3346(a)(2) means that
> it only applies to a person presently serving as Acting
> Commissioner if at the time of nomination, someone "is
> performing the functions and duties" in accordance with
> the FVRA. There is no good reason for construing the
> word "serving" when used in the first paragraph of
> § 3346(a) differently than when it is used in § 3346(b).

<u>Id.</u> at 629-30 (emphasis in original).

As discussed above, interpreting the phrase "the person
<u>serving</u> as the acting officer" in Section 3346(a) as descriptive

48

rather than as a limitation to individuals presently holding the acting official role comports with common sense. Moreover, "[i]t makes sense that Congress, having written the subsection that allowed a person to serve during the pendency of a nomination in [Section 3346](a)(2), would say that such a person could 'continue' their service after such a nomination failed[ and thus t]hat word choice does not support the idea that a person 'serving' under [Section 3346](a) must be 'currently serving.'" Brent Z. v. Kijakazi, No. 22CV511, 2023 WL 1110449, at *15 (D. Minn. Jan. 30, 2023) (unpublished) (recommendation). Furthermore, the Brian T.D. court's emphasis on the "continue to serve" language in Sections 3346(b)(1) and 3346(b)(2) actually undermines that court's reasoning. In those sections, Congress made clear that an acting official may "continue to serve" in that role for 210 days after the failure of a first or second nomination to the Senate. 5 U.S.C. §§ 3346(b)(1), (b)(2). Had Congress wished to allow an acting official to continue to serve beyond the initial 210 days only if a nomination occurred during that initial 210-day period, Congress could easily have included that same "continue to serve" language in Section 3346(a)(2), but did not do so.

The Brian T.D. court next maintained that "§ 3348 confirm[ed its] reading" of Section 3346(a)(2) because, "[u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is

49

complete." <u>Brian T.D.</u>, 580 F. Supp. 3d at 630 (quoting 5 U.S.C. § 3348(b)). The court disagreed with the Commissioner's "interpret[ation of] § 3346 as providing a person with authority to serve in an acting role (as distinct from merely defining the length of that service)," and pointed out that "§ 3345 [] provides the authority to act as an officer, while § 3346 merely defines the period of that service." <u>Id.</u> at 632. In other words, the court reasoned, "[s]omeone cannot avoid § 3348's directive that the 'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." <u>Id.</u>

The <u>Brian T.D.</u> court provided no authority for its interpretation that Section 3346 prescribes only time limits on acting service. <u>See id.</u> In fact, Section 3346(a)(2) does not just address time limits for acting service, i.e., "for the period that the nomination is pending in the Senate," as that Section also prescribes a <u>condition</u>, i.e., a nomination to the Senate, which triggers an additional period of service. Moreover, Section 3348(b)(1) explicitly ties the "remain vacant" provision to the phrase "performing the functions and duties in accordance with sections <u>3345</u>, <u>3346</u>, and 3347," 5 U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill stepped into the role pursuant to President Obama's Succession Memo upon then-Acting Commissioner

50

Colvin's resignation in accordance with Section 3345(a)(3), as well as immediately resumed performing the duties of the office in an acting capacity upon Saul's nomination in accordance with § 3346(a)(2), § 3348(b)(1) did not require the office to "remain vacant."  See Sidney M., 2022 WL 4482859, at *17-18 (rejecting Brian T.D.'s interpretation of "remain vacant" provision of Section 3348(b)).

The Brian T.D. court further based its interpretation of Section 3346(a)(2)'s inapplicability to Berryhill on the following analysis of the meaning of the word "or":

> [The Commissioner's] interpretation [of Section 3346(a)] misreads the statutory language.  The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose.  Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service.
>
> A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; *or* . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination.  *Id.* § 3346(a) (emphasis added).  The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).  In this statute "or" serves to provide an alternative *length* of service not to create a series of non-contiguous periods of service.  If the statute were read to create three distinct periods of service — the initial 210 days, the first nominee period, and the second nominee period — the statute would have used the word "and" to separate the three periods of service.
>
> Construing the word "or" to mean "and," as [the Commissioner] argues for here, is conjunctive and "clearly in contravention of its ordinary usage." *Id.*

51

The plain reading and ordinary usage of the word "or" in § 3346(a) is that a person serving as Acting Commissioner may serve for a 210-day period from the start of the vacancy, **or** if the person is already "serving as acting officer" according to the FVRA, may continue serving during the pendency of a timely nomination. The 210-day period is a limitation on Berryhill's acting service and after the 210-day limitation had expired, she could not later return to acting service, turning § 3346's "or" into an "and."

Brian T. D., 580 F. Supp. 3d at 631 (emphasis supplied by Brian T.D.).

The Commissioner persuasively argues that the Brian T.D. court's above-quoted interpretation of the word "or" in Section 3346(a)(1) constitutes an unreasonable construction of that commonly-used word:

The use of "or" to mean either one or both of two options is routine. "The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). "'The meaning of *or* is usually inclusive.'" *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. G-05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995)). For example, if a server comes to a table and asks whether anyone would like "dessert or coffee," no one would interpret that to preclude ordering both.

(Docket Entry 16 at 16 n.5 (underscoring added).) Indeed, as well-explained by another district court:

Authorities agree that . . . or has an inclusive sense as well as an exclusive sense." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011). In its inclusive sense, "or" means "A or B, or both." *Id.* In its exclusive sense, "or" means "A or B, but not both." *Id.* Although "or" is used in both senses in common usage, "[t]he meaning of or is usually inclusive." *Id.* (quoting Scott J. Burnham, *The Contract Drafting Guidebook* 163 (1992)) (internal quotation marks omitted).

52

> [The defendant] argues as if the court must choose
> between construing "or" in its exclusive sense or
> construing it to mean "and." But . . . both senses of
> "or" are commonly used. In fact, the inclusive use of
> "or" is the more common.

B-50.com, LLC v. InfoSync Servs., LLC, No. 3:10CV1994, 2014 WL
285096, at *6-7 (N.D. Tex. Jan. 27, 2014) (unpublished) (emphasis
added) (certain citations omitted); see also Great Lakes Ins. SE v.
Lassiter, No. 21-21452-CIV, 2022 WL 1288741, at *10 (S.D. Fla. Apr.
29, 2022) (unpublished) ("If the [p]olicy sought to use 'or' in an
exclusive sense, then it would have prevented such overlap by
prefacing the definition with a qualifier like 'either.'" (emphasis
added)); Mason v. Range Res.-Appalachia LLC, 120 F. Supp. 3d 425,
445 (W.D. Pa. 2015) ("'Stating the matter broadly, we can say that
in a permissive sentence the inclusive "or" is interchangeable with
the several "and." Again, this does not say that "and" means "or."
It says that in such a context the two words are reciprocally
related: the implied meaning of one is the same as the express
meaning of the other.'" (quoting Maurice B. Kirk, Legal Drafting:
The Ambiguity of "And" and "Or," 2 Tex. Tech L. Rev. 235, 243
(1971))); Allstate Ins. Co. v. Plambeck, 66 F. Supp. 3d 782, 788
(N.D. Tex. 2014) (noting that, "[a]bsent a qualifying 'either,'
'or' is typically interpreted in the inclusive manner" and
explaining that statute in question lacked "limiting words or
phrases — such as 'either' or 'but not both' — that might support

53

reading [the statute]'s use of 'or' in the 'exclusive' sense" (emphasis added) (internal quotation marks omitted)).

Here, the word "or" appears in a permissive sentence, i.e., "the person serving as an acting officer as described under section 3345 <u>may serve</u> in the office," 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as "either" and "but not both," <u>see id.</u> Accordingly, the Court should interpret the word "or" in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill to serve both as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), and to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2).[11] Notably, Congress did <u>not</u> include language in Section 3346(a)(2) clarifying that the period of service under that Section applied <u>only if the nomination to the Senate occurred during the pendency of the initial, 210-day period of service</u>. See <u>SW Gen., Inc.</u>, 580 U.S. at 300-01 (rejecting NLRB's interpretation of Section 3345 of the FVRA, while noting that Congress "could easily have chosen clearer language," as well as finding that "'[t]he fact that Congress did not adopt [] readily available and apparent

---

[11] As the Commissioner notes, "[t]he *Brian T.D.* court's reading of 'or' does not even comport with its *own* interpretation of the term as 'disjunctive, indicating an alternative.' [<u>Brian T.D.</u>, 580 F. Supp. 3d at 63.] The court did not hold that an acting officer could serve only pursuant to subsection (1) or subsection (2) [of Section 3346(a)], but not both. Instead, the court *subordinated* the second clause to the first one; its reading permits the person presently serving as an acting officer to serve (i) during the 210-day period, and then also (ii) during the pendency of a nomination, if – but only if – the nomination is submitted within that 210-day period. The word 'or' cannot conceivably support such a reading." (Docket Entry 16 at 22.)

54

alternative [language] strongly support[ed]'" the Supreme Court's interpretation of Section 3345 (brackets omitted) (quoting <u>Knight v. Commissioner</u>, 552 U.S. 181, 188 (2008)).[12]

Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and that Section 3346(a)(2) authorizes a second, permissible period of service for Berryhill:

> <u>Under new section 3346(a)(2)</u>, and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. <u>The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted</u>.

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added).[13] Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA. <u>Compare</u> S.2176, 105th Cong.,

---

[12]  Another section of the FVRA makes clear that Congress knew how to include language indicating that certain time periods for service did not permit breaks in service:

> [T]he President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department <u>without a break in service</u>, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

5 U.S.C. § 3345(c)(1) (emphasis added).

[13]  The version of the FVRA Congress ultimately passed expanded the term an acting official could serve from 150 days to 210 days. <u>See</u> 5 U.S.C. § 3346(a).

55

§ 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

The Brian T.D. court focused on a different part of the FVRA's legislative history to support its reasoning. Section 3348(b) of Senate Bill 2176 provided, in pertinent part, as follows:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs--
>
> (A) the office shall remain vacant until the President submits a first nomination to the Senate; and . . .
>
> (2) if the President does not submit a second nomination to the Senate within 150 days after the date of the rejection, withdrawal, or return of the first nomination--
>
> (A) the office shall remain vacant until the President submits a second nomination to the Senate.

S.2176, 105th Cong., § 3348(b), available at www.congress.gov/bill/105th-congress/senate-bill/2176/text (emphasis added) (quotation marks omitted). The Brian T.D. court found that the absence of the above-emphasized language in FVRA's final text supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill:

> The FVRA's final text does not include the express "spring-back" language. Publ. L. 105-277, § 151, 112 Stat. 2681 (Oct. 21, 1998). Enacting the FVRA included a "period of intense negotiations" and resulted in "a compromise measure." [SW Gen., Inc., 580 U.S. at 307]. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." Id.
>
> Here, the Senate Report shows that the Senate considered allowing an officer who had previously acted as

56

Commissioner to return to acting service upon a nomination to the Senate, however Congress chose not to include such language in the final, enacted version of the FVRA. Certainly, the original language of § 3348 demonstrates that if Congress had intended the FVRA to contain a spring back provision they were able to craft such language to clearly and unambiguously express that intent. At best the reliance on the Senate Report illustrates the folly of attempting to discern legislative intent from statements made during the legislative process. *See id.* at [307]; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572[] (2011) ("When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.").

Brian T.D., 580 F. Supp. 3d at 633.

Brian T.D.'s reasoning falls short, because the Senate Report did not tie its interpretation of Section 3346(a)(2) as a spring-back provision to the language in Section 3348(b) providing that the office remain vacant "until the President submits a first [or second] nomination to the Senate," 5 U.S.C. § 3348(b) (emphasis added); rather, the Report grounded its interpretation in the language of Section 3346 itself:

Under new section 3346(a)(2), . . . [t]he acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, 1998 WL 404532, at *14 (emphasis added). Moreover, as recognized by another district court:

The Congressional Record contains an explanation for th[e] change [in Section 3348(b)] from one of the FVRA's sponsors (in October 1998):

Changes were made to § 3348(b) to provide that the vacant office provisions of the

57

> legislation apply not only when an acting
> officer has served more than 210 days without
> a nomination for the office having been
> submitted to the Senate, but also prior to the
> 210 days after the vacancy occurs unless an
> officer of [sic] employee performs the
> functions of the vacant office in accordance
> with [the FVRA].

> The legislative history from October 1998, after the text
> of § 3348(b)(1) was changed, continues to support that
> [ S]ection [3346](a)(2) applied when a nomination was
> pending, even if the initial 210-day period had already
> run at the time of nomination.

Bauer, 2022 WL 2918917, at *8-9 (footnote omitted) (citing 144
Cong. Rec. 27,497 (1998)); see also 144 Cong. Rec. 27,498 (1998)
(noting that "the language of the [FVRA] is crafted in such a way
as to allow for the filling of a vacant office once the President
submits a nomination to the Senate" (emphasis added)).

Moreover, cases interpreting the application of Section
3346(a)(2) have overwhelmingly rejected the reasoning of Brian
T.D.. See Brent Z., 2023 WL 1110449, at *13 (providing lengthy and
detailed analysis of FVRA's statutory language and "agree[ing] with
the Commissioner, joining the majority of courts to consider the
issue and respectfully disagreeing with other decisions to the
contrary in the District of Minnesota . . . [that t]he plain text
of the [FVRA] indicates Acting Commissioner Berryhill was lawfully
filling the Commissioner's office on an acting basis when she
ratified [the] ALJ['s ] appointment" (underscoring added) (standard
capitalization applied) (bold font omitted)); Coe v. Kijakazi, No.
5:22CV226, 2023 WL 554119, at *11-13 (D.S.C. Jan. 27, 2023)

58

(unpublished) (holding that "analysis begins with looking at the plain language of the statute," and that "[t]he court agrees with the majority of the courts to have considered this issue — the plain language of the FVRA provides that Berryhill could resume her role as Acting Commissioner of the SSA as of the date Andrew Saul was nominated for Commissioner"); Hernandez v. Kijakazi, No. 22CV1556, 2022 WL 17751355, at *16 (D.N.J. Dec. 19, 2022) (unpublished) (conducting searching analysis of FVRA's text and legislative history to "find[] that Berryhill was validly serving as Acting Commissioner under 5 U.S.C. § 3346(a) of the FVRA when she ratified the appointment of [the p]laintiff's ALJ in 2018"); Taylor v. Kijakazi, No. 1:21CV648, 2022 WL 4668273, at *9 (M.D.N.C. Aug. 2, 2022) (unpublished) (Webster, M.J.) (noting "agree[ment] with the other judges from this Court, Circuit, and others who have considered this issue at considerable length and concluded that this appointment clause argument [under the FVRA] has no merit"), recommendation adopted, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (unpublished) (Osteen, J.); Lance M., 2022 WL 3009122, at *11 ("[T]he plain language and legislative history of the FVRA confirm that Berryhill could resume her service after Saul's nomination was submitted notwithstanding the fact that her original 210-day period expired before the Senate received his nomination."); Williams v. Kijakazi, No. 1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (unpublished) (characterizing holding in Brian T.D. as "an

59

outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and the Legislative Branch - all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired"); Early v. Kijakazi, No. 5:21CV96, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) (unpublished) (expressly disagreeing with Brian T.D. and holding: "[T]he plain language of 5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role as Acting Commissioner on the date that Andrew Saul was nominated. Consequently, she had the necessary statutory authority to ratify the appointment the ALJs in 2018 and [the p]laintiff's [] argument fails."), appeal filed sub nom., Rush v. Kijakazi, No. 22-1797 (4th Cir. June 21, 2021).[14]

---

[14] Cases decided prior to Brian T.D. similarly found Section 3346(a)(2) to contain a "spring back" provision. See, e.g., Thomas S. v. Commissioner of Soc. Sec., No. C21-5213, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022) (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that [] Saul was nominated for Commissioner in April 2018."); Reuter, 2020 WL 7222109, at *15 ("Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. . . . Immediately following the GAO[ Notice], [] Berryhill stepped down from her role as Acting Commissioner and continued to lead the agency from her [DCO] position of record. . . . [H]owever, on April 17, 2018, the President nominated [] Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination."); Patterson, 2018 WL 8367459, at *1 ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination.").

Additionally, the DOJ has, <u>since at least 1999</u>, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> <u>The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted.</u> If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative. <u>If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.</u>

DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted). Like the DOJ, the GAO - the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, <u>see</u> GAO Notice, at 1 - also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to the Senate, <u>see</u> GAO, No. B-328888, "Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA "contains a <u>spring-back provision</u> that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official

61

whose initial 210-days had expired "could resume her service as
Acting Director . . . when the President submitted [a] nomination
to the Senate" (emphasis added)).

Lastly, Plaintiff contends that "the SSA statutory restriction
on the President's removal authority does not apply merely to the
confirmed head of [the] SSA but also more broadly to '[a]n
individual serving in the Office of Commissioner'" (Docket Entry 13
at 18 (quoting 42 U.S.C. § 902(a)(3))), "including [] an individual
serving in an acting capacity for the time allowed under the law"
(id. at 19 (citing Sylvia A., 2021 WL 4692293, at *3, Albert, 2021
WL 3424268, at *3, Tafoya, 2021 WL 3269640, at *5, and Dante, 2021
WL 2936576, at *8)). Plaintiff thus asserts that, "even if [then-
Acting Commissioner] Berryhill were acting appropriately under
[the] FVRA, her actions would still be *ultra vires* because of the
unconstitutional removal protections," as well as that "[t]he
appropriate remedy when the ALJ lack[s] a proper appointment from
a constitutional [C]ommissioner in violation of the Appointments
Clause is to remand the matter to a different and properly
appointed official" (id. (citing Carr v. Saul, ___U.S. ___, 141 S.
Ct. 1352 (2021), Lucia, ___ U.S. at ___, 138 S. Ct. at 2044, and
Probst, 980 F.3d at 1023)).

The statutory language of Section 902 belies Plaintiff's
position for three reasons. To begin, comparison of the language
in the portion of Section 902 authorizing the Commissioner with the

62

portion authorizing the Deputy Commissioner (who serves as <u>Acting</u> Commissioner in the Commissioner's absence, disability, or vacancy) supports the position that the President can remove an Acting Commissioner at will. The applicable portion of that statute provides as follows:

(a) Commissioner of Social Security

(1) There shall be . . . a Commissioner of Social Security . . . who shall be appointed by the President, by and with the advice and consent of the Senate.

. . .

(3) The Commissioner shall be appointed for a term of 6 years . . . . <u>An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office</u>.

. . .

(b) Deputy Commissioner of Social Security

(1) There shall be . . . a Deputy Commissioner of Social Security . . . who shall be appointed by the President, by and with the advice and consent of the Senate.

(2) The Deputy Commissioner shall be appointed for a term of 6 years . . . . In any case in which a successor does not take office at the end of a Deputy Commissioner's term of office, such Deputy Commissioner may continue in office until the entry upon office of such a successor. A Deputy Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term.

. . .

(4) The Deputy Commissioner shall perform such duties and exercise such powers as the Commissioner shall from time to time assign or delegate. <u>The Deputy Commissioner shall be Acting Commissioner of the Administration during the absence or disability of the Commissioner and, unless</u>

63

the President designates another officer of the
Government as Acting Commissioner, in the event of a
vacancy in the office of the Commissioner.

42 U.S.C. § 902 (emphasis added). Thus, although the portion of
Section 902 governing the Commissioner includes an express removal
for cause provision, see 42 U.S.C. § 902(a)(3), the corresponding
provision in the portion of Section 902 involving the Deputy
Commissioner lacks any such language, see 42 U.S.C. § 902(b)(2).
Notably, the Supreme Court has cautioned that a statute must
expressly place limits on the President's authority to remove
executive agency heads at will. See Collins, ___ U.S. at ___, 141
S. Ct. at 1783 ("[W]e generally presume that the President holds
the power to remove at will executive officers and that a statute
must contain plain language to take [that power] away.").

Second, the removal provision explicitly applies only to "[a]n
individual serving in the office of Commissioner," 42 U.S.C.
902(a)(3) (emphasis added). Thus, by its very terms, Section
902(a)(3)'s removal provision does not apply to an individual
serving in the office of the Acting Commissioner.

Third, Section 902(b)(4) expressly accords the President the
power to "designate[] another officer of the Government as Acting
Commissioner" other than the Deputy Commissioner in the event of a
vacancy in the office of Commissioner. 42 U.S.C. § 902(b)(4)
(emphasis added). That broad authority to designate any other
"officer of the Government as Acting Commissioner" during a vacancy

64

further supports the view that the removal restriction applicable to the office of Commissioner does not apply in the same manner to the office of Acting Commissioner.

Moreover, the cases upon which Plaintiff relies as holding that Acting Commissioners enjoy removal protection (see Docket Entry 13 at 19 (citing Sylvia, Albert, Tafoya, and Dante)), all addressed that matter in the procedural posture of a motion to dismiss for lack of standing, see Sylvia A., 2021 WL 4692293, at *3; Albert, 2021 WL 3424268, at *3; Tafoya, 2021 WL 3269640, at *5; Dante,2021 WL 2936576, at *5. Those courts found, at the threshold stage of a standing-based motion to dismiss, that Section 902(a)(3)'s language "[a]n individual serving in the office of Commissioner" could encompass the Acting Commissioner in the removal for cause provision. Id.

In contrast, cases addressing the merits of Seila Law/Collins claims have found that Section 902(a)(3) does not limit the authority of the President to remove an Acting Commissioner. See Standifird v. Kijakazi, No. 20CV1630, 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021) (unpublished) (recommendation) ("Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because [the] ALJ [] was properly appointed, [the p]laintiff's argument is not persuasive . . . ."); Alice T. v. Kijakazi, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021) (unpublished) ("[T]he ALJ's decision in this case was issued

65

on July 17, 2019, one month after [then-Commissioner Andrew] Saul took office. The ALJ who decided [the p]laintiff's case was appointed by then-Acting Commissioner [Nancy] Berryhill, who could be removed from that office at the President's discretion."); Lisa Y., 570 F. Supp. 3d at 1001 n.1 ("[The Commissioner] correctly contends [that Nancy] Berryhill, as Acting Commissioner, was properly appointed and not subject to § 902's removal clause."); Boger v. Kijakazi, No. 1:20CV331, 2021 WL 5023141, at *3 (W.D.N.C. Oct. 28, 2021) (unpublished) ("Indeed, [the p]laintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the] ALJ [in question] was appointed by an Acting Commissioner of Social Security who could be removed from that office at the President's discretion." (citing 42 U.S.C. § 902(b)(4), Collins, ___ U.S. at ___, 141 S. Ct. at 1783, and United States v. Eaton, 169 U.S. 331, 343 (1898))).

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018. Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court should find that Berryhill lawfully ratified the SSA's ALJs'

66

appointments as her own on July 16, 2018, and thus that Plaintiff's second issue on review fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 22, 2023